# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| STEPHANIE KOUREMBANAS,<br>CARIDAD JEAN BAPTISTE, CATHY<br>MANDE, and CATHARINE VALLEY,<br>on behalf of themselves and all others<br>similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>INTERCOAST COLLEGES, d/b/a<br>INTERCOAST CAREER INSTITUTE,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. Civ. _____ |

## CLASS ACTION COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiffs Stephanie Kourembanas, Caridad Jean Baptiste, Cathy Mande, and Catharine Valley, on behalf of themselves and all others similarly situated, complain against Defendants InterCoast Colleges, d/b/a InterCoast Career Institute, as follows:

### Summary of the Action

1.      Plaintiffs, on their own behalves and as representative of a class consisting of former practical nursing ("LPN") students who were enrolled at InterCoast Career Institute in Kittery or South Portland, Maine between 2011 and 2016, bring this action seeking recovery for unfair and deceptive trade practices, fraud, negligent misrepresentation, and breach of contract.

## Parties

2.     Plaintiff Stephanie Kourembanas is a resident of Lynn, Massachusetts. She began her LPN studies at InterCoast in November 2014 and completed the program in February 2016.

3.     Plaintiff Caridad Jean Baptiste is a native of Haiti and is now a resident of South Boston, Massachusetts. She began her LPN studies at InterCoast in June 2013 and remained a student there until InterCoast dismissed her from the program in September 2014.

4.     Plaintiff Cathy Mande is a native of Congo and is now a resident of Charlestown, Massachusetts. She began her LPN studies at InterCoast in November 2014 and remained a student there until InterCoast dismissed her from the program in April 2015.

5.     Plaintiff Catharine Valley is a resident of Ossipee, New Hampshire. She began her LPN studies at InterCoast in February 2014 and remained a student there until she completed the program in June 2015.

6.     InterCoast Colleges ("InterCoast") is a California corporation that operates for-profit post-secondary educational programs in a variety of fields, including medical assistant, paralegal, massage therapist, and substance abuse counselor studies. In Maine, InterCoast did business under the name of InterCoast Career Institute.

## Jurisdiction and Venue

7.     This Court has jurisdiction of Plaintiffs' claims under 28 U.S.C. § 1332(d), as there is complete diversity of citizenship and the aggregate amount in controversy, considering the claims of all potential class members, is in excess of $5,000,000, exclusive of interest and costs.

8.     Venue is proper in this District as InterCoast operated its LPN program in Maine, all of the Plaintiffs traveled to Maine to participate in InterCoast's LPN program, and many of the operative facts arose in Maine.

## Class Action Allegations

9.     Plaintiffs seek to maintain this action as a class action under Rule 23(b)(1), 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure.

10.     The number of prospective class members — nursing students enrolled at InterCoast's LPN program in Maine between 2011 and 2016 — numbers between 250 and 300 individuals. The class is so numerous that joinder of all members is impracticable, as required by Rule 23(a)(1).

11.     There are questions of law and fact common to the class, as required by Rule 23(a)(2). These include (a) whether InterCoast's practices in attracting, recruiting, and soliciting Plaintiffs and other class members for enrollment in its LPN Program were unfair and deceptive under applicable state laws, (b) whether InterCoast made intentional or negligent misrepresentations, including misrepresentations concerning its

accreditation status, upon which Plaintiffs and other class members relief in enrolling in the LPN Program, (c) whether InterCoast provided Plaintiffs and other class members with educational services that complied with minimal standards and/or the representations made by InterCoast, and (d) whether InterCoast unlawfully used the incentive of federal financial aid to lure Plaintiffs and other class members into its LPN Program, only to saddle them with student loan debt they cannot repay due to InterCoast's failure to provide them with accredited, quality educational services required to obtain necessary licenses and jobs.

12.     As set forth below, the claims of the Plaintiffs are typical of the claims of the other members of the class, as required by Rule 23(a)(3).

13.     The Plaintiffs will fairly and adequately protect the interests of the other class members, as required by Rule 23(a)(4). All Plaintiffs are prepared to participate actively in the litigation against InterCoast and represent the interests of others similarly situated.

## FACTS COMMON TO ALL COUNTS

### A.    FOR-PROFIT COLLEGES

14.     InterCoast is one of approximately 2000 for-profit colleges in the country where enrolled students are eligible to receive federal financial aid through the United States Department of Education under Title IV of the Higher Education Act of 1965. These schools, also known as "proprietary

institutions of higher education," are required by federal law to "prepare students for gainful employment in a recognized occupation." 34 C.F.R. § 600.5; *see id.* § 668.8(d)(1)(iii).

15.     For-profit colleges offer a wide array of programs. Many offer diplomas and associate's degrees in vocational fields, such as medical billing, cosmetology, massage therapy, and web page design. These programs frequently require enrollment for one to two years.

16.     In recent years the number of students attending for-profit colleges increased faster than the number of students attending traditional public and non-profit colleges and universities. Students at for-profit colleges are disproportionately older and drawn from lower income backgrounds than students at traditional public and non-profit colleges and universities.

17.     Federal financial aid programs under Title IV have been a critical component of the rapid growth of for-profit colleges. Title IV programs include the Direct Loan Program, Stafford Loans, and the Pell Grant Program. Federal financial aid to for-profit colleges under these programs exceeds $20 billion per year, with approximately 80% of this aid in the form of loans and 20% in the form of Pell Grants.

18.     Under the federal Title IV loan programs, students receive loans for their education directly from the United States. Each for-profit college receives the loan proceeds and typically credits them to the student's account

5

to pay for tuition and other charges. Students must repay these loans, including all applicable interest. The loans of InterCoast students have come directly from the United States since at least the 2012-2013 academic year.

19.    For many years there have been concerns about extensive fraud and abuse committed by for-profit schools that take advantage of federal financial aid programs without giving students a useful education in return. As the Congressional Research Service explained:

>During the late 1980s and into the 1990s, the General Accounting Office (GAO), Congress, and Office of the Inspector General (IG) at the U.S. Department of Education conducted investigations of student aid programs and found evidence of extensive fraud and abuse; some of the worst examples of these practices were found at proprietary schools. . . . When default rates peaked nationwide in 1990, default rates at proprietary schools reached 41% compared with an overall default rate of 22%. Many proprietary schools were failing to provide students with a quality education or training in occupations with job openings, focusing instead on obtaining federal student aid dollars. As a result, students left proprietary institutions with no new job skills or few prospects of employment in their field of study and burdened with substantial loan debt. . . . [P]roprietary institutions that were overly dependent on Title IV revenue were considered institutions that were not providing a high quality education, and institutions that might be misusing federal dollars.
>Congressional Research Service, *Institutional Eligibility & the Higher Education Act: Legislative History of the 90/10 Rule and Its Current Status* (updated Jan. 19, 2005), at 3-4, *available at* http://www.policyarchive.org/handle/10207/bitstreams/1904.pdf.

20.    In 1992 these concerns led Congress to require for-profit colleges to derive a minimum percentage of their revenue from non-Title IV sources. The current version of this rule is commonly referred to as the "90/10 rule," because for-profit colleges must derive at least 10% of their revenue from non-Title IV sources.

21.    The 90/10 rule did not eliminate the problem of fraud and abuse at for-profit colleges, however. The problem has continued to grow as the number of students and the amount of federal financial aid going to for-profit schools has grown. The GAO studied a sample of 15 for-profit colleges (identified in part by focusing on schools that barely satisfied the 90/10 rule) and summarized key findings as follows:

> Undercover tests at 15 for-profit colleges found that 4 colleges encouraged fraudulent practices and that all 15 made deceptive or otherwise questionable statements to GAO's undercover applicants. Four undercover applicants were encouraged by college personnel to falsify their financial aid forms to qualify for federal aid—for example, one admissions representative told an applicant to fraudulently remove $250,000 in savings. Other college representatives exaggerated undercover applicants' potential salary after graduation and failed to provide clear information about the college's program duration, costs, or graduation rate despite federal regulations requiring them to do so. . . . Programs at the for-profit colleges GAO tested cost substantially more for associate's degrees and certificates than comparable degrees and certificates at public colleges nearby. A student interested in a massage therapy

certificate costing $14,000 at a for-profit college was told that the program was a good value. However, the same certificate from a local community college cost $520. *For-Profit Colleges – Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices: Testimony Before the S. Comm. on Health, Educ., Labor, & Pensions* (Aug. 4, 2010) (statement of Gregory D. Kutz, Managing Director Forensic Audits & Special Investigations), *available at* http://www.gao.gov/new.items/d10948t.pdf.

22.     Fraud and abuse by for-profit colleges, their frequent failure to provide an education remotely commensurate with their promises, and their high tuition bills remain subjects of great concern in Congress and throughout the country. Although some of these colleges may provide useful and fairly-priced educational services, many more are leaving students with nothing to show from their "education," other than federal student loan debt. In promulgating new rules designed to address these problems, the U.S. Department of Education reported for the 2008 academic year that "46 percent of student loans (weighted by dollars) borrowed by students at two-year for-profit institutions are expected to go into default over the life of the loans, compared to 16 percent of loans borrowed by students across all types of institutions." *Program Integrity: Gainful Employment—Debt Measures*, 76 Fed. Reg. 34,386, 34,387 (June 13, 2011).

23.     The consequences of this federal student loan debt are severe and far reaching. As the Department of Education has explained:

Former students who are not gainfully employed and cannot afford to repay their loans face very serious challenges. Discharging Federal student loans in bankruptcy is very rare. The common consequences of default include large fees—collection costs that can add 25 percent to the outstanding loan balance—and interest charges; struggles to rent or buy a home, buy a car, or get a job; collection agency actions, including lawsuits and garnishment of wages; and the loss of tax refunds and even Social Security benefits. Moreover, borrowers in default are no longer entitled to any deferments or forbearances and may be ineligible for any additional student aid until they have reestablished a good repayment history. *Id*.

## B. INTERCOAST COLLEGES.

24. InterCoast operates for-profit college programs in several jurisdictions across the United States, with most of its programs located in the State of California.

25. InterCoast operated a practical nursing education program in Kittery, Maine (and, later, in South Portland, Maine) from approximately 2009 until it closed the program in early 2016 ("InterCoast LPN Program").

26. The InterCoast LPN Program was a sham. It existed to make money without regard for the quality of education its students received in exchange. InterCoast provided little, if any, educational value to its students and failed to enhance their occupational qualifications or career prospects. Among other failings, InterCoast did not provide qualified faculty members to teach required courses, did not provide adequate clinical experiences for its

students, and did not adequately prepare its students for taking the National Council Licensing Examination for Practical Nurses ("NCLEX-PN"), which they had to pass to become LPNs and obtain work in their chosen field.

27.    InterCoast nonetheless charged each enrolled student approximately $36,000 to participate in its LPN Program, and financed this scheme by enrolling almost exclusively students who received federal financial aid in the form of federal student loans.

28.    InterCoast played an extensive role in the financial aid process for Plaintiffs and potential class members, which included gathering and submitting the students' necessary paperwork to the United States Department of Education. InterCoast worked to maximize the aid each student received from the federal government so as to maximize the number of students able to pay its high tuition. InterCoast treated the United States Department of Education as its cash source, with the students serving unwittingly as the means by which InterCoast enriched itself at the expense of both the students and the public fisc.

29.    The InterCoast LPN Program was, and InterCoast overall continues to be, exceptionally dependent on federal financial aid programs.

30.    In 2010, InterCoast opened the Kittery campus for its LPN Program in an effort to attract and enroll students from the Merrimack Valley and Greater Boston areas of Massachusetts. This pool of prospective

10

practical nursing students included many individuals who were unqualified, unable, or ineligible to attend existing LPN education programs in Massachusetts due to the more stringent entrance examination requirements utilized by these programs.

31.    The InterCoast LPN Program targeted these students in northeastern Massachusetts with radio, video, and print advertisements that highlighted its Kittery campus and LPN Program offerings. Three video commercials concerning the LPN Program that feature a Maine telephone number or reference InterCoast's Kittery and South Portland campuses remain on the internet. https://www.youtube.com/watch?v=F48ntEG-v7g; https://www.youtube.com/watch?v=g2oWe5e4MX0; and https://www.youtube.com/watch?v=kho2vOa8wO4

32.    In September 2010, InterCoast received approval from the Maine State Board of Nursing ("BON") for its LPN Program. According to 32 M.R.S. § 2101, the Maine BON "is the state regulatory agency charged with protection of the public health and welfare in the area of nursing service."

33.    Under 32 M.R.S. §§ 2104 and 2153-A, the Maine BON has broad authority to evaluate and regulate nursing education programs in Maine to ensure compliance with state law, and to approve such programs that comply with the law. Further, section 2153-A provides the Maine BON with authority to establish the criteria and standards for nursing education

programs in Maine, and to deny or withdraw approval of programs if such criteria and standards are not satisfied. These criteria and standards are set forth in Chapter 7 of the Maine BON Rules, and include minimum standards for administration, faculty, students, curriculum, facilities, services, records, and program evaluation.

34.    In July 2012, in response to student complaints, the Maine BON launched an investigation of the InterCoast LPN Program. The Maine BON investigation began with allegations concerning the poor quality of the clinical sites affiliated with the InterCoast LPN Program.

35.    The Maine BON then became aware of additional problems at InterCoast, which included extremely low pass rates, in comparison to other nursing schools, and "naïve faculty" who were "unable to articulate a philosophy of LPN education."

36.    The Maine BON also received complaints from InterCoast students concerning the subpar education they received, the lack of qualified instructors, changes in grades (from passing to failing) without notice, and attempts to block students from viewing their exam results and grades.

37.    In September 2012, the Maine BON voted to offer InterCoast a consent agreement pursuant to 32 M.R.S. § 2153-A(6), which would have the effect of placing the InterCoast LPN Program on probationary status.

38.     The Maine BON and InterCoast then entered into a consent agreement in March 2013 ("Consent Agreement"), a true copy of which is attached as <u>Exhibit 1</u>.  The Consent Agreement was designed to address InterCoast's violations of Chapter 7 of the Maine BON Rules, including "concerns regarding the oversight of faculty and students, relationships between [InterCoast] and the clinical sites, and an apparent lack of structure or enforcement of structure" at the InterCoast LPN Program.

39.     The Consent Agreement required InterCoast to make changes to its LPN Program so as to obtain "candidacy" status from the National League for Nursing Accrediting Commission ("NLNAC") within twelve months, and to secure full accreditation from NLNAC within eighteen months.

40.     In entering into the Consent Agreement, InterCoast acknowledged that failure to meet the Maine BON's timelines for accreditation "shall result in the automatic revocation, without hearing or judicial review or appeal, of its certificate of approval for all of [its] LPN programs in the State of Maine . . . ."

41.     Per the Consent Agreement, InterCoast also covenanted to provide the Maine BON, among other things, with the pass rates for each of its LPN Program's classes, written quarterly reports concerning its progress toward obtaining NLNAC accreditation, and the credentials and date of hire for all members of the LPN Program faculty.

42.   InterCoast's president, Geeta Brown, executed the Consent Agreement on March 4, 2013.

43.   Despite the Consent Agreement, InterCoast still had failed to make the appropriate changes and obtain the necessary accreditation from NLNAC by August 2014. The Maine BON issued an Amended Consent Agreement, a true copy of which is attached as Exhibit 2, requiring InterCoast to comply with the accreditation requirement by January 2015.

44.   A Second Amended Consent Agreement executed between the Maine BON and InterCoast, a true copy of which is attached as Exhibit 3, confirmed that InterCoast had failed to meet the accreditation and administrative requirements of the original Consent Agreement, and acknowledged InterCoast's decision to cease operations in Maine.

45.   InterCoast began to wind down operations and completely ceased to operate in Maine by March 2016.

46.   Although the InterCoast LPN Program was based in Maine, it drew many of its students from northeastern Massachusetts. The bulk of InterCoast's students were poor, relatively uneducated minority women from Massachusetts who viewed InterCoast as a means to become employed as an LPN quickly and easily.

47.   The InterCoast LPN Program was attractive to Plaintiffs and other students because it (a) purported to provide an accredited program for

14

educating prospective LPNs, (b) had no wait list for admission, unlike most competing community colleges and state programs, (c) offered rolling admissions, with new students starting each quarter, (d) had more lenient entry criteria than competing schools, and (e) managed all of the logistics for taking out the necessary student loans, such that all students had to do was sign the loan documents provided to them by InterCoast.

48.     InterCoast administrators told students that they would "make it right" if there ever were an issue with the program's accreditation. This statement was an intentional or negligent misrepresentation.

49.     After enrolling at the InterCoast LPN Program, many students were dismissed by InterCoast because of purposeful grade changes made by InterCoast's Nursing Director, Andrea Gauntlett, or for other spurious reasons. Many students were unable to obtain proof of why they had been dismissed, and were unable to determine whether or not they passed courses.

50.     Ms. Gauntlett and other InterCoast staff created a fearful environment and continually threatened to dismiss students from the program. This caused most students to refrain from speaking out due to the risk that anything they said could diminish their chances of graduating.

51.     Each Plaintiff and most class members took out enormous student loans to cover InterCoast's $36,000 tuition. Yet few received a certificate for completing the program in the end, and even fewer passed the

NCLEX-PN. Those that did pass the NCLEX-PN typically relied on their own efforts to learn the material necessary to pass the test, as InterCoast offered no serious training or preparation to assist its practical nursing students in taking and passing the NCLEX-PN.

52.     Between 2013 and 2015, the national first time NCLEX-PN pass rate was 82.65% (2013: 86.72%; 2015: 83.24%; 2015: 85.05%).  For InterCoast's Maine students, it was 51.31% (2013: 75.5%; 2014: 42%; 2015: 36.44%). See http://www.state.me.us/boardofnursing/NCLEX/2013-2015%20NCLEX%203%20Year%20Average%20Pass%20Rates.pdf.

53.     Throughout the period when InterCoast was having problems obtaining accreditation, it sugar-coated the issue in communicating with prospective and existing students, stating that receipt of NLNAC accreditation was a "mere formality."

54.     InterCoast's academic program was weak and did not meet basic standards for an LPN education program. The InterCoast LPN Program also failed to comply with LPN clinical requirements, i.e., internships and rotations in maternity, pediatrics, geriatrics, and mental health. Instead, InterCoast gave lip service to actual clinical experience, while mostly having its students watch videos.

55.     Most competing community college LPN programs—such as Essex Community College or Middlesex Community College—required nine

months of study and cost approximately $15,000 in tuition. By contrast,
InterCoast's program required fifteen months of attendance and cost
approximately $36,000.

56.    InterCoast used a "bait and switch" technique with Tuition
Options, the third-party loan administrator for InterCoast and its students,
so as to obtain student signatures on student loan documents to fund their
enrollment in the LPN Program.

57.    Between 2011 and 2015, InterCoast received $78,182,973.00 in
Federal Title IV of the HEA Funding (2011-2012: $21,842,448; 2012-2013:
$21,863,507; 2013-2014: $19,813,073; 2014-2015: $14,663,945).  See U.S.
Department of Education, Annual Reports available at:

https://studentaid.ed.gov/sa/about/data-center/school/proprietary.

58.    Due to the substandard program provided by the InterCoast LPN
Program, the certificates awarded to those fortunate enough to complete the
program were essentially worthless. InterCoast LPN graduates attempting to
enroll in a registered nursing ("RN") degree program have been routinely
rejected due to InterCoast's lack of accreditation. Students in this position
have had to "start over" to be educated in a combined LPN/RN program.

59.    Plaintiffs and most members of the proposed class left InterCoast
saddled with a large student loan debt as a direct result of InterCoast's
scheme to generate revenue through federal financial aid programs. These

students lack the ability to become LPNs capable of earning the income necessary to pay off their indebtedness. This has resulted in student loan defaults, which can prevent qualification for other student loans to attend legitimate educational institutions in the future. Such student loan debt also can destroy students' credit ratings and impair their ability to pass workplace background checks for years into the future. Although InterCoast did well in earning money off its students, it did not serve their educational interests because its only concern was with profit, not education.

60.     Plaintiffs all enrolled at the InterCoast LPN Program on the basis of its material misrepresentations about the quality and occupational benefits of the education it would provide them. Each took out thousands of dollars in federal student loans to pay for tuition at InterCoast, but none received a remotely adequate education in return. The Plaintiffs' experiences at the InterCoast LPN Program are typical of the many students who have attended InterCoast.

61.     InterCoast, acting through the employees in its admissions and financial aid offices, among others, made these representations to prospective students about the quality of the InterCoast LPN Program to induce them to enroll and take out substantial student loans. These representations to prospective students were knowingly false. InterCoast did not fulfill its promises and obligations to the students who enrolled.

## C.    EXPERIENCES OF THE PLAINTIFFS AT INTERCOAST.

### Stephanie Kourembanas

62.    Stephanie Kourembanas enrolled in the InterCoast LPN Program on November 3, 2014.

63.    Ms. Kourembanas initially identified InterCoast through a Google search. She was attracted by InterCoast's rolling admissions policy and the absence of any requirement to take or pass the Test of Essential Academic Skills ("TEAS") to gain admission to the LPN Program.

64.    When she visited InterCoast to discuss enrolling in the LPN Program, Ms. Kourembanas was told that the program was accredited and that, upon completion of the program, she could sit for her boards and be able to work in Massachusetts or pursue higher education.

65.    When Ms. Kourembanas asked questions about accreditation, InterCoast's representative told her that the school was already accredited, but was seeking a second, "higher level" of accreditation. The representative specifically told her that, if InterCoast did not receive this second level of accreditation, InterCoast would "make things right" and that she would not have to worry. The representative also told her that InterCoast's classes were taught at "an RN level," that the LPN Program was "amazing," and that InterCoast provided a great deal of help to its LPN students.

19

66.    InterCoast arranged for Ms. Kourembanas to obtain student loans, for which her current indebtedness is approximately $39,706. She received no grants or scholarships.

67.    While enrolled at InterCoast, Ms. Kourembanas had to drive from Massachusetts to attend classes in Kittery or, later, South Portland (a 100-mile trip from her home) four days per week.

68.    Toward the end of her educational programming at InterCoast, Ms. Kourembanas learned, with only two days' notice, that InterCoast would be closing the Kittery campus. InterCoast misrepresented that the reason for this closure was about the landlord's inability to remedy an HVAC issue.

69.    After the Kittery campus closed, Ms. Kourembanas had to drive approximately 40 extra miles each way to attend the South Portland campus and finish her classes.

70.    One month before completion of the program, InterCoast informed Ms. Kourembanas that it had made an error and that she owed additional money. It forced her to sign additional loan documents with Tuition Options, informing her that failure to sign those documents would prohibit her from sitting for the NCLEX test that is necessary to become licensed. Ms. Kourembanas complied with InterCoast's instructions, because she had no real choice at that point.

71.     Although she passed the NCLEX-PN on her first attempt on March 25, 2016, Ms. Kourembanas accomplished this through her own individual efforts to prepare and study for this testing; InterCoast did not prepare her to pass the exam.

72.     Ms. Kourembanas is current on her loan payments, but has been unable to pursue higher education, as she had hoped. The colleges to which she has applied are unwilling to accept her InterCoast credits due to the program's lack of accreditation.  She has been told that she would have to start over to pursue the education she requires to become an RN. Her post-secondary education is on hold due to the hurdles erected by InterCoast.

**Caridad Jean Baptiste**

73.     Caridad Jean Baptiste attended the InterCoast LPN Program from June 17, 2013 through September 2014, which was the month she should have graduated.

74.     A friend introduced Ms. Jean Baptiste to InterCoast, and she was attracted by InterCoast's lack of a wait list and easy admission requirements.

75.     She entered into a student loan arrangement engineered by InterCoast to pay for her tuition.  She submitted a cash deposit with her application, took a $20,000 federal student loan, took $15,000 loan financed by Tuition Options, and had to pay another $3,000 to repeat the third term.

76.    Ms. Jean Baptiste successfully completed her first two terms at InterCoast with passing grades. She was forced to repeat the third term.

77.    Prior to the examination at the conclusion of her fourth and final term in September 2014, InterCoast dismissed her for allegedly "failing standard," based on charges that she had plagiarized a project.

78.    Andrea Gauntlett, InterCoast's Nursing Program Director, was instrumental in terminating Ms. Jean Baptiste's education at InterCoast. Ms. Gauntlett specifically complained about the fact that English was Ms. Jean Baptiste's second language.

79.    The clinical classes for which Ms. Jean Baptiste paid InterCoast were deeply inadequate. She received hardly any actual experience in a clinical setting and was left completely unprepared to become an LPN.

80.    To pay off the $35,000 she borrowed to attend InterCoast, Ms. Jean Baptiste has been repaying the loan at the rate of $315 per month, despite never receiving her certificate and having nothing to show for her time in the InterCoast LPN Program.

**Cathy Mande**

81.    Cathy Mande attended the InterCoast LPN Program for only one semester, November 2014 through April 2015.

82.    Ms. Mande learned of InterCoast's LPN Program through a friend. She was attracted to the program because there was no difficult entry

22

exam and InterCoast promised that she could become an LPN quickly through its fifteen-month program.

83.    Ms. Mande paid approximately $1,000 upfront, and took out student loans arranged by InterCoast to fund the remainder of her tuition. InterCoast arranged all of the loan paperwork, so all she had to do was sign.

84.    During her attendance at InterCoast, Ms. Mande received nursing instruction from a faculty member that did not know the subject well. The instructor separated the class into two groups: one comprised of minority students, and the other of exclusively white students.

85.    The InterCoast instructor ridiculed Ms. Mande and other minority students in her class for whom English was a second language, mocking their pronunciations of words. The instructor's negative treatment of Ms. Mande affected her personal life, as she was not able to eat well or focus on other aspects of her life due to the stress from school.

86.    In April 2015, Ms. Mande sat for her final exam for the semester. She still has received no indication from InterCoast whether she passed the exam. InterCoast has not responded to any of her communications, other than to say she would receive a call back. She ceased attending after that semester given the negative experience she had endured.

87.    Ms. Mande continues to pay for InterCoast. She was informed in June 2016 that she owed $7,651, more than double the figure she had been

quoted initially. She continues to receive collection calls, including one threatening to take the money owed from her income tax refund.

88.    Ms. Mande continues to make installment payments because she is afraid of getting in trouble with authority. She has two young boys to support, and does not want to jeopardize her sons' futures by refusing to pay. She has received notices informing her that if she does not pay on time, she will become responsible for late fees.

**Catharine Valley**

89.    Catharine Valley attended the InterCoast LPN Program from March 24, 2014 until her graduation on June 22, 2015.

90.    Ms. Valley learned of InterCoast through a radio advertisement.

91.    She was attracted to InterCoast because it had no waiting list, unlike other programs to which she had applied, and because the admissions requirements were light. InterCoast's entry exam required her to spend only about three minutes filling out answers to twelve simple questions.

92.    Ms. Valley inquired about InterCoast's accreditation status and was told that the "State" has accredited the program. InterCoast misrepresented that it was seeking a higher level of accreditation as "icing on the cake," and told her not to worry about it.

93.    InterCoast arranged all of her financial aid, which included approximately $26,000 in federal student loans. InterCoast's initial quote of a

24

$150 per month payment plan has proved to be inaccurate. InterCoast has demanded an additional $5,000 to obtain release of her transcript.

94.     Ms. Valley completed all required coursework at InterCoast, earning a grade point average of 3.74.

95.     Despite this, Ms. Valley has learned that none of her credits from the InterCoast LPN Program are transferable to an educational program for RNs because InterCoast lacked accreditation from any accrediting organization approved by the U.S. Department of Education.

96.     Ms. Valley has paid a total of $36,878 to InterCoast and continues to have student loan indebtedness she is being forced to repay, despite receiving no benefit from the InterCoast LPN Program.

**All Plaintiffs**

97.     Plaintiffs incurred substantial debt to pay for their education in the InterCoast LPN program. In the end, they were dismissed from the program, or were left unprepared to pass the NCLEX and become LPNs. Most Plaintiffs and potential class members have been unable to obtain work as LPNs, despite their InterCoast education.

98.     Plaintiffs have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendant's past and ongoing actions set forth above. Plaintiffs paid large sums of money to attend the InterCoast LPN Program, mostly by taking out large student loans.

25

99.    In the absence of Defendant's actions, Plaintiffs would not have paid this money and taken out these loans and/or would have gained the necessary skills, knowledge, and experience to obtain gainful employment in their field of study allowing them to earn the income needed to manage their student loans.

100.   As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered additional financial injuries because they have lost past wages. Plaintiffs have devoted significant time to attend and study for classes at InterCoast. In the absence of Defendant's actions, Plaintiffs would otherwise have devoted that time to working at paying jobs.

101.   As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered additional financial injuries because they will lose future wages. In the absence of Defendant's actions, Plaintiffs would have received an education that enhanced their future earning capacity by allowing them to work in jobs in their field of study.

102.   As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered, and in the future will continue to suffer, humiliation, embarrassment, and mental and emotional distress.

103.   In causing injury to Plaintiffs, Defendant acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

26

104.   Without relief, Plaintiffs are also likely to be injured by damaged credit. Plaintiffs are now required to make monthly payments that they cannot afford. If they default on their student loans it will substantially impair their ability to get credit in the future. Such defaults will also substantially impair their ability to find new employment because credit reports are often used by employers as part of background checks.

105.   On October 11, 2016, more than 30 days prior to the filing of this Complaint, undersigned counsel sent a notice letter as required by law to InterCoast's counsel, setting forth a written demand for relief, identifying the claimants involved, and reasonably describing the unfair and deceptive acts or practices relied upon, and the injuries suffered.

## CAUSES OF ACTION

### COUNT I
### (Violation of 5 Me. Rev. Stat. § 213, By All Plaintiffs)

106.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 105 above.

107.   The Maine Unfair Trade Practices Act ("UTPA") provides that "unfair or deceptive acts or practices in conduct of any . . . commerce are declared unlawful." Me. Rev. Stat. tit. 5, § 207.

108.   The Maine UTPA provides for a private right of action by any purchaser of services where the seller has violated the proscription set forth

in section 207. Me. Rev. Stat. tit. 5, § 213.

109.   By virtue of the foregoing, InterCoast violated the Maine UTPA by engaging in unfair and/or deceptive practices, including by misrepresenting the nature of the services offered in its LPN Program and the program's accreditation status, so as to cause Plaintiffs pecuniary loss and other damages.

## COUNT II
### (Violation of Massachusetts G.L. Ch. 93A, By Plaintiffs Kourembanas, Jean Baptiste, and Mande)

110.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 109 above.

111.   The Massachusetts Consumer Protection Act, also known as Chapter 93A, provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws Ann. Ch. 93A, § 2.

112.   By virtue of the foregoing, InterCoast violated Chapter 93A by engaging in unfair and deceptive acts or practices, including misrepresenting the nature of the services offered in its LPN Program and the program's accreditation status, so as to cause Plaintiffs Kourembanas, Jean Baptiste, and Mande pecuniary loss and other damages.

## COUNT III
**(Violation of N.H. Rev. Stat. § 358-A, By Plaintiff Valley)**

113.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 112 above.

114.   Chapter 358-A:2 of the New Hampshire Revised Statutes Annotated provides: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state.  Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to . . . [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ; [and] [a]dvertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity . . . ."

115.   By virtue of the foregoing, InterCoast violated Chapter 358-A of the New Hampshire Revised Statutes Annotated by engaging in deceptive acts and practices, including misrepresenting the availability and nature of the services offered in its LPN Program and the program's accreditation status, so as to cause pecuniary loss and other damages to Plaintiff Valley.

## COUNT IV
### (Breach of Contract, By All Plaintiffs)

116.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 115 above.

117.   Each Plaintiff entered into a contractual relationship with InterCoast by virtue of enrolling in the InterCoast LPN Program.

118.   As part of this contract, in exchange for payment of $36,000 of tuition, InterCoast promised to provide Plaintiffs with an accredited program of nursing education sufficient to permit them to prepare for taking the NCLEX, become LPNs, and obtain work in the field of practical nursing.

119.   Each Plaintiff paid the consideration—tuition payments demanded by InterCoast—as required by the contract.

120.   InterCoast breached the contract, however, by failing to provide Plaintiffs with an accredited educational program of sufficient quality to prepare them for taking the NCLEX, become LPNs, and obtain work in the field of practical nursing.

121.   As a direct and proximate result of this breach, Plaintiffs have suffered and will continue to suffer economic damages. All Plaintiffs have incurred significant expense to pay the required tuition charges, and are now faced with substantial student loan debt, without the benefit promised to them under the contract.

## COUNT V
### (Fraudulent Inducement to Contract, By All Plaintiffs)

122.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 121 above.

123.   InterCoast, to induce Plaintiffs to enter into contracts to enroll in the InterCoast LPN Program, made positive statements of fact regarding the quality and content of the education it would provide, and the accreditation status of the program, that were false, material to the contract, and relied upon by Plaintiffs in deciding to enroll.

124.   InterCoast knew that its statements regarding the quality and content of the education it promised to provide to Plaintiffs, and the program's accreditation status, were false at the time they were made and did not intend to satisfy the statements at the time they were made.

125.   Plaintiffs' justifiably relied on these misrepresentations to their detriment by enrolling in and paying to attend the InterCoast LPN Program.

## COUNT VI
### (Intentional Misrepresentation, By All Plaintiffs)

126.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 125 above.

127.   InterCoast falsely represented to Plaintiffs that its LPN Program was or would become accredited by NLCAC, and would provide nursing

31

education of a sufficient quality to permit them to prepare for taking the NCLEX, become LPNs, and obtain work in the field of practical nursing.

128.   InterCoast made these misrepresentations with knowledge of their falsity or in reckless disregard of whether they were true or false for the purpose of inducing Plaintiffs to enroll in the InterCoast LPN Program.

129.   Plaintiffs' justifiably relied on these misrepresentations to their detriment when they enrolled in and paid for the InterCoast LPN Program.

<u>**COUNT VII**</u>
**(Negligent Misrepresentation, By All Plaintiffs)**

130.   Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 129 above.

131.   InterCoast had a pecuniary interest in the enrollment of Plaintiffs in its LPN Program.

132.   InterCoast supplied false information to Plaintiffs when it stated that its LPN Program was or would become accredited by NLCAC, and would provide nursing education of a sufficient quality to permit them to prepare for taking the NCLEX, become LPNs, and become gainfully employed.

133.   InterCoast failed to exercise reasonable care or competence to verify that its LPN Program was or would become accredited by NLCAC, and would provide quality nursing education sufficient to permit them to prepare for taking the NCLEX, become LPNs, and obtain gainful employment.

134.   Plaintiffs justifiably relied upon this false information when they enrolled in and paid the costs for the InterCoast LPN Program.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant it the following relief:

(1)   Enter a declaratory judgment that the foregoing acts, policies, and practices of the InterCoast LPN Program violated the applicable state consumer protection acts; constituted breach of contract; constituted fraudulent inducement to contract; constituted intentional misrepresentation; and constituted negligent misrepresentation;

(2)   Enter an injunction directing InterCoast and its directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the conduct described in this Complaint, including but not limited to requiring InterCoast to pay off the balances remaining due on the student loans of Plaintiffs and all those similarly situated;

(3)   Award compensatory damages to Plaintiffs, and all those similarly situated, in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by InterCoast's conduct, including but not limited to the compensation for the funds Plaintiffs have paid out-of-pocket for tuition at InterCoast;

(4)   Award punitive damages to Plaintiffs, and all those similarly situated, in an amount to be determined by the jury that would punish InterCoast for the willful, wanton, and reckless conduct alleged in this Complaint so as to effectively deter similar conduct in the future;

(5)   Award Plaintiffs their reasonable attorneys' fees and costs;

(6)   Award prejudgment interest to Plaintiffs; and

(7)   Order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury as to all issues in this case that are so triable by right.

Dated: August 29, 2017          Respectfully submitted,


/s/ James Clifford
James Clifford
james@cliffordclifford.com

/s/ Andrew P. Cotter
Andrew P. Cotter
andrew@cliffordclifford.com

CLIFFORD & CLIFFORD
Post Road Center
62 Portland Rd. Suite 37
Kennebunk, ME 04043
(207) 985-3200

/s/ Richard L. O'Meara
Richard L. O'Meara
romeara@mpmlaw.com

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651

Counsel for Plaintiffs